2010 ME 17

**GUARDIANSHIP OF JEWEL M.**

Supreme Judicial Court of Maine.

Argued: Jan. 14, 2010.
Decided: March 9, 2010.

Amanda E. Ramirez, Esq. (orally), McGarry & Holmes, LLC, Wells, ME, for the father.

John A. Turcotte, Esq. (orally), Ainsworth, Thelin & Raftice, P.A., South Portland, ME, for the maternal grandmother.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN,* and JABAR, JJ.

LEVY, J.

[¶ 1]  The father of Jewel M. appeals from a judgment of the York County Probate Court (*Bailey, J.*) appointing guardianship of the child to the maternal grandmother pursuant to 18–A M.R.S. § 5–204(c) (2009).  On appeal, the father argues that the court erred by (1) conclud-

ing that the statutory standard of a temporarily intolerable living situation had been established as applied to him, and (2) denominating the guardianship to be a permanent guardianship when only a temporary guardianship was actually established.  We affirm the judgment with modifications.

## I.  BACKGROUND

[¶ 2]  In June 2007, the mother and the father were divorced.  The divorce judgment granted the mother primary physical custody of their daughter, Jewel, then age two, and the father was granted rights of contact.  A month after the divorce judgment, the mother moved with Jewel to an apartment in Biddeford that the grandmother provided for them.

[¶ 3]  The grandmother began spending most days of the week with Jewel.  The father had visits with Jewel through Christmas 2007.  In early January 2008, he was charged with operating under the influence and a follow-up surprise visit to his residence in Holden by police revealed that he was in possession of alcohol, marijuana, and drug paraphernalia in violation of his conditions of release.  He did not visit with Jewel again until August 2008.

[¶ 4]  In the spring of 2008, the relationship between the mother and the grandmother began to deteriorate, and in April 2008, the mother was hospitalized for substance abuse treatment.  After the mother completed the treatment program in August 2008, she began to foster contact between the father and Jewel and allowed visitation.  Around this time, however, the mother changed the locks on the apartment and stopped paying rent to the grandmother.  Eventually, she moved with

---

* Although not available at oral argument, Justice Gorman participated in this opinion.  *See* M.R.App. P. 12(a) ("A qualified justice may participate in a decision even though not present at oral argument.").

Jewel to an unknown location where Jewel was exposed and subjected to domestic violence by the mother's boyfriend. The Probate Court found that Jewel was physically abused during this time period by the boyfriend and another individual. Although the father was visiting Jewel during this time period, he never entered the mother's residence and had no reason to suspect these events were occurring.

[¶ 5] The grandmother filed petitions for guardianship and temporary guardianship in September 2008, but did not provide notice of the same to the father. She was awarded temporary guardianship on September 17, 2008. Shortly thereafter, Jewel was evaluated by the Spurwink Child Abuse Program and was diagnosed with post-traumatic stress disorder. She has since been treated by a therapist and has shown improvement since beginning play therapy.

[¶ 6] In January 2009, the father moved to dissolve the temporary guardianship. A hearing on his motion and on the issue of the permanent guardianship was scheduled for April 9, 2009. On the day of the hearing, the mother and the father signed an agreement to modify their parental rights judgment in the District Court by awarding the primary residential care of the child to the father, with rights of contact to the mother. The agreement also provided that the mother's contact would be supervised until both her mental health provider and the child's mental health provider agreed that supervision was unnecessary. In light of the agreement, the guardian ad litem (GAL) recommended that the court grant the grandmother a continued temporary guardianship to allow Jewel a slow and steady transition to the father's home over a five-month period. She also recommended that the father make arrangements for an appropriate therapist to be available to treat Jewel once she comes into his care.

[¶ 7] After the hearing, the court issued the judgment that is the subject of this appeal. The court found that the grandmother would provide a living situation that was in the best interests of the child, and that a temporarily intolerable living situation existed as to both parents. See 18-A M.R.S. § 5-204(c) (2009).[1] The court based its conclusion with respect to the father on its findings that: (1) he lacked a parental rights order giving him the primary residential care of Jewel; (2) he had had limited and inconsistent contact with Jewel; (3) he had not arranged for a qualified therapist to be available to treat Jewel near his home; and (4) he had yet to establish through hair follicle drug testing that he was drug-free.[2] Therefore, the court granted the grandmother's petition.

[¶ 8] In establishing the guardianship, the court adopted the majority of the

1. Title 18-A M.R.S. § 5-204(c) (2009) provides:

The court may appoint a guardian or co-guardians for the unmarried minor if:

. . . .

(c) The person or persons whose consent is required under subsection (b) do not consent, but the court finds by clear and convincing evidence that the person or persons have failed to respond to proper notice or a living situation has been created that is at least temporarily intolerable for the child even though the living situation does not rise to the level of jeopardy required for the final termination of parental rights, and that the proposed guardian will provide a living situation that is in the best interest of the child.

2. With respect to the mother, a temporarily intolerable living situation was found to exist based on the mother's history of substance abuse and unsafe and unstable living conditions, and that she had "expos[ed] the child to mental and physical abuse while in her care."

GALs recommendations. It ordered that the guardianship would terminate when the father provided proof that: (1) the District Court had approved the parents' agreement and modified the parental rights and responsibilities order; (2) the father had found a qualified therapist for Jewel near his home; and (3) the father had passed a hair follicle drug test. Upon satisfaction of these conditions, the father would gain complete care, custody, and control of Jewel. To that end, the court also granted the father's motion to dissolve the temporary guardianship. In the interim, however, the court ordered that the father have a graduated visitation schedule with Jewel.

[¶ 9] This appeal by the father followed. Both parties represent that since the filing of this appeal, the father's visitation schedule established by the court has been complied with and that the father has been awarded the primary residential care of Jewel by the District Court.

## II. DISCUSSION

[¶ 10] The father contends that the Probate Court erred by (A) concluding that a temporarily intolerable living situation would exist if Jewel were to live with him pursuant to 18–A M.R.S. § 5–204(c), and (B) describing the guardianship it granted as permanent when the judgment establishes terms akin to a temporary guardianship. Statutory interpretation is a matter of law that we review de novo. See Guardianship of Zachary Z., 677 A.2d 550, 552 (Me.1996). We review the Probate Court's factual findings for clear error. See Guardianship of Autumn S., 2007 ME 8, ¶ 5, 913 A.2d 614, 616.

A. Temporarily Intolerable Living Situation

[¶ 11] The father's arguments, which center on the sufficiency of the evidence to support the court's findings and conclusions, are essentially twofold: (1) that the court should not have concluded that a temporarily intolerable living situation existed with respect to him because the court did not find that he was an unfit parent or that there are environmental conditions in his home that may have a negative effect on his daughter's emotional or physical well-being; and, (2) that the court's key factual findings were either not supported by competent evidence or were contradictory. We first construe section 5–204(c), and we then review the court's factual findings for clear error and consider those findings in relation to our construction of the statute.

### 1. Construction of Section 5–204

[¶ 12] Title 18–A M.R.S. § 5–204(c) does not define the term "temporarily intolerable ... living situation." 18–A M.R.S. § 5–204(c). Our construction of that term is informed, however, by the fundamental liberty interest parents have in parenting their children. See Guardianship of Jeremiah T., 2009 ME 74, ¶ 27, 976 A.2d 955, 962. Because a temporarily intolerable living situation must relate to a parent's inability to care for the child, proof of parental unfitness is a required element to support the establishment of a guardianship over the parent's objection. Id. The statute's requirement of a "living situation ... that is at least temporarily intolerable for the child even though the living situation does not rise to the level of jeopardy required for the final termination of parental rights," 18–A M.R.S. § 5–204(c), thus requires the court to find that the parent's inability to meet the child's needs constitutes an urgent reason that "may have a dramatic, and even traumatic, effect upon the child's well-being," Rideout v. Riendeau, 2000 ME 198, ¶ 26, 761 A.2d 291, 301, if the child lives with the parent.

[¶ 13] Accordingly, a guardianship may only be ordered pursuant to section 5–204(c) if the court finds that (1) the parent is currently unable to meet the child's needs and that inability will have an effect on the child's well-being that may be dramatic, and even traumatic, if the child lives with the parent, and (2) the proposed guardian will provide a living situation that is in the best interest of the child. This standard is, as indicated in section 5–204(c), less stringent than the standard for finding jeopardy. *See* 22 M.R.S. § 4002(6) (2009).[3] Although a temporarily intolerable living situation may arise from the physical condition of a parent's residence, it is by no means restricted to that circumstance. *Cf. Guardianship of Emma M.,* 2003 ME 89, ¶ 3, 828 A.2d 776, 777 ("The court appropriately examined evidence of the mother's prior abuse to ascertain the child's living situation in the context of determining [the mother's] current ability to care for her daughter.").

### 2. The Probate Court's Factual Findings

[¶ 14] The father argues that the Probate Court's key findings in support of its conclusion that a temporarily intolerable living situation existed are clearly erroneous. A finding of fact is clearly erroneous when (1) no competent evidence supporting the finding exists in the record; (2) the fact-finder clearly misapprehends the meaning of the evidence; or (3) the force and effect of the evidence, taken as a whole, rationally persuades us to a certainty that the finding is so against the great preponderance of the believable evidence that it does not represent the truth and right of the case. *Wells v. Powers,* 2005 ME 62, ¶ 2, 873 A.2d 361, 363. We address each of the court's four findings individually.

### a. Lack of a Family Matter Order

[¶ 15] The record establishes that the mother and the father had signed an agreement to modify the divorce judgment on the day of the guardianship hearing, but that neither party had filed a motion to amend the family matter judgment, and the agreed-to order had not yet been submitted to the District Court.[4] The record therefore supports the court's finding that there was no court order in effect granting

---

3. Title 22 M.R.S. § 4002(6) (2009) defines jeopardy as follows:

   **6. Jeopardy to health or welfare or jeopardy.** "Jeopardy to health or welfare" or "jeopardy" means serious abuse or neglect, as evidenced by:

   A. Serious harm or threat of serious harm;

   B. Deprivation of adequate food, clothing, shelter, supervision or· care or education when the child is at least 7 years of age and has not completed grade 6;

   C. Abandonment of the child or absence of any person responsible for the child, which creates a threat of serious harm; or

   D. The end of voluntary placement, when the imminent return of the child to his custodian causes a threat of serious harm.

4. In the setting of a guardianship proceeding, if the Probate Court learns of an existing judgment that determined the parental rights and responsibilities of the parents, or of a pending action to determine parental rights and responsibilities, the judge may communicate with a judge of the other court to ascertain the status of that judgment or action and to coordinate the management of the related cases. Similarly, if a District Court Judge or a Family Law Magistrate handling a family matter petition learns of an existing guardianship order or a pending matter in the Probate Court that may affect the parental rights and responsibilities of the parties, that judge or magistrate may communicate with the probate judge to ascertain the status of that judgment or action and to coordinate the management of the related cases. *See* M.Code Jud. Conduct I(3)(B)(7)(c) ("A judge may consult with court personnel, or persons appointed by the court, whose function is to aid the judge in carrying out the judge's adjudicative responsibilities, or with other judges.").

the father the right to Jewel's primary residential care.

### b. Limited and Inconsistent Contact with the Child

[¶ 16] Contrary to the father's contention, the record contains significant evidence supporting the court's conclusion that the father had had limited and inconsistent contact with Jewel. The father stopped seeing Jewel sometime around Christmas 2007 and did not resume visitation with her until August 2008. Although the father enjoyed substantial contact with Jewel for a six-week period in August and September 2008, the record establishes that he did not visit with Jewel again after this six-week period until a visitation schedule was established, as memorialized in a court order dated April 1, 2009. Additionally, the GAL reported that Jewel's therapist "still has questions about if [the father] can commit long term" and "[i]f [the child] is rushed in her placement with [the father], [she] will go quiet and will be retraumatized and ... will continue to live in fear." Thus, the therapist recommended a "slow and steady transition to [the] father's home" due to these concerns. In its decision, the court cited the therapist's opinion "that a sudden shift to residence with [the father] would be traumatic to Jewel." The court's findings that the father had had limited and inconsistent contact with Jewel and that a sudden shift in her residence would be traumatic for her were not erroneous, and these findings, in and of themselves, were a sufficient basis for the court to order that the guardianship be extended to allow Jewel's placement to be transferred in a safe and reasonable fashion.

### c. Failure to Have a Qualified Therapist

[¶ 17] The father testified at the hearing that he had been unable to find a therapist for Jewel in his area, and that the Department informed him that Jewel would need to be on his insurance plan before they could locate a provider for her. This evidence supports the court's conclusion that the father had not found a qualified therapist for Jewel in his area at the time of the hearing. Although this finding, considered in isolation, might not support a court concluding that a temporarily intolerable living situation exists under the unique circumstances of this case, it was certainly relevant to the overall determination of that question.

### d. Failure to Establish Sobriety through Hair Follicle Testing

[¶ 18] The evidence in the record indicates that the father has had at least three arrests related to substance use, including two arrests for possession of marijuana and one arrest for operating under the influence. Early in the proceedings, the father had declined to take a hair follicle drug test when the GAL requested one, explaining that he did not have a primary care physician and could not afford the test. The GAL agreed that a random urine test would suffice. The father purchased a test kit, was prepared to take it, and on several occasions he offered to take the test only to be told that the timing was not random enough. Consequently, a urine test was never completed. The GAL ultimately reported to the court that there was no evidence that the father was currently using drugs or had a drug problem.

[¶ 19] In its judgment, the Probate Court found that there was "no evidence that his OUI conviction represents a pattern of behavior for [the father], nor is there evidence that he has a substance abuse issue." The court found that the father was attending school to be an Emergency Medical Technician, he has a

job in place for when he graduates, and "that he will be required to submit to drug testing in order to maintain his position as an EMT." The court also noted as part of its findings that the GAL had concluded that there is no evidence that the father is currently using drugs or has a drug problem.

[¶ 20] Notwithstanding the preceding findings related to the absence of proof of a substance abuse problem, the court determined that a temporarily intolerable living situation existed as to the father because of his "failure to establish through hair follicle testing that he is drug-free." This finding cannot be reconciled with the court's other findings or with the total body of evidence. We thus conclude that the court erred in its implicit determination that the evidence established a need for the father to prove through hair follicle testing that he was drug-free. We modify the order by striking this erroneous finding.

### 3. Conclusion

[¶ 21] Jewel's need for a slow, steady transition of increasing contact with the father, and the father's need to finalize his custody rights in the family matter and procure a therapist for Jewel, considered together, established a temporarily intolerable living situation. If Jewel were placed immediately with the father without the opportunity for a transition and before the father could legally assert a right to custody superior to that of the mother, the resulting situation would be, as the court found, traumatic for Jewel and contrary to her well-being. We affirm the court's ultimate conclusion regarding temporarily intolerable living conditions.

### B. Guardianship Order

[¶ 22] The father argues that the court erred because it characterized its order as a "permanent guardianship" when only a temporary guardianship was actually established pursuant to 18–A M.R.S. §§ 5–201 to 5–212 (2009). The question of whether a guardianship is temporary or permanent is a question of law that we review de novo. *See Guardianship of Zachary Z.*, 677 A.2d at 552.

[¶ 23] A temporary guardianship is a guardianship established pursuant to 18–A M.R.S. § 5–207(c) (2009) that "may not last longer than 6 months."[5] A permanent guardianship, in contrast, has no specific time period and terminates "upon the death, resignation or removal of the guardian or upon the minor's death, adoption, marriage or attainment of majority." *See* 18–A M.R.S. § 5–210 (2009). Resignation or removal proceedings must be initiated by petition pursuant to 18–A M.R.S. § 5–212(a) (2009). The establishment of both temporary and permanent guardianships, however, is governed by 18–A M.R.S. §§ 5–204, 5–207.

[¶ 24] In its order granting a guardianship, the court adopted the GAL's rec-

---

**5.** Title 18–A M.R.S. § 5–207(c) (2009) provides in its entirety:

(c) If necessary, the court may appoint a temporary guardian, with the status of an ordinary guardian of a minor, but the authority of a temporary guardian may not last longer than 6 months [unless one of the parents is a member of the National Guard or Armed Forces under an order to active duty].

Notice of hearing on the petition for the appointment of a temporary guardian must be served as provided under subsection (a), except that the notice must given at least 5 days before the hearing, and notice need not be given to any person whose address and present whereabouts are unknown and can not be ascertained by due diligence. Upon a showing of good cause, the court may waive service of the notice of hearing on any person, other than the minor, if the minor is at least 14 years of age.

ommendations: a slow and steady transition for the child to the father's home; a resolution of the family matter giving the father primary residence; and the identification of a therapist for Jewel near the father's residence. The GAL's graduated visitation schedule, which the court accepted, would result in the father receiving complete custody of the child within five months. The court therefore clearly contemplated that the guardianship would remain in effect for a limited, defined period of less than six months; further, the court did not instruct the father to initiate a new petition seeking the termination of the guardianship once the conditions have been satisfied. Because the guardianship satisfies the criteria for a temporary guardianship pursuant to 18–A M.R.S. § 5–207(c); the court erred in characterizing it as a permanent guardianship. We modify the judgment accordingly.

[¶ 25] Both parties represented at oral argument that the father's visitation had occurred as required by the court's judgment and that the father had been awarded residential care of Jewel by the District Court in the family matter. We expect that once the father has provided the Probate Court with the name of a licensed qualified therapist for Jewel, the court will terminate the guardianship and Jewel will be transferred to her father's custody without condition. Therefore, we affirm the judgment as modified. We are not persuaded by, and do not separately address, the father's remaining arguments.

The entry is:

Judgment is modified in accordance with this opinion and, as modified, is affirmed.