2010 ME 80

**GUARDIANSHIP OF JEWEL M.**

Supreme Judicial Court of Maine.

Submitted on Briefs: July 21, 2010.
Decided: Aug. 17, 2010.

Amanda E. Ramirez, Esq., McGarry & Holmes, LLC, Wells, ME, for father.

John A. Turcotte, Esq., Ainsworth, Thelin & Raftice, P.A., South Portland, ME, for grandmother.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

ALEXANDER, J.

[¶ 1]  In this appeal we address, again, an issue that has recently arisen with some frequency: the quality of evidence that must be presented and standards of proof that must be met to remove a child from a parent's care and custody through a guardianship proceeding. *See* 18–A M.R.S. § 5–204(c) (2009).  For the second time, the father of Jewel M. appeals from a judgment of the York County Probate Court (*Bailey, J.*) granting the child's maternal grandmother's petition for a tempo-

rary guardianship, establishing the grandmother as Jewel's temporary coguardian along with the father. *See Guardianship of Jewel M. (Jewel I )*, 2010 ME 17, 989 A.2d 726.

[¶ 2]  The father argues that the Probate Court erred by: (1) granting the grandmother's petition because relitigation of the issues involved is barred by res judicata; (2) failing to consider the father's parental fitness before establishing the temporary guardianship; and (3) concluding that the living situation at the father's residence is temporarily intolerable pursuant to 18–A M.R.S. § 5–204(c). The father also argues that attorney fees and costs should be assessed against the grandmother. Because the court's findings, based on the evidence submitted, cannot support the imposition of a guardianship in a contested proceeding, we vacate and remand with direction to terminate the temporary coguardianship awarded to the grandmother and allow the father to parent his child. We decline to award attorney fees.

## I. GOVERNING LEGAL STANDARDS

[¶ 3]  Before addressing the particular circumstances of this appeal, it is useful to review the legal standards that govern a case when a third party, here the grandmother, invokes legal process to attempt to limit or remove a parent's fundamental right to parent his or her child.

[¶ 4]  A decade ago, the United States Supreme Court ruled that a parent has a fundamental liberty interest in parenting his or her child—an interest that cannot be infringed without strict adherence to the Due Process Clause, which: "does not per-

mit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made." *Troxel v. Granville*, 530 U.S. 57, 72–73, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). Thus, the United States Supreme Court has observed that the state has only a "de minimis" interest in child care decision-making by a fit parent. *See Stanley v. Illinois*, 405 U.S. 645, 657–58, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). Reflective of this "de minimis" state interest, "there is a presumption that fit parents act in the best interests of their children." *Troxel*, 530 U.S. at 68, 120 S.Ct. 2054 (citing *Parham v. J.R.*, 442 U.S. 584, 602, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979)).

[¶ 5]  The same year that *Troxel* was decided, we ruled similarly in *Rideout v. Riendeau*, 2000 ME 198, ¶ 18, 761 A.2d 291, 299, addressing a grandparents' visitation statute, a law that, like the guardianship statute as applied in this case, "allows the courts to determine whether parents will be required to turn their children over to the grandparents against the parents' wishes," *id.* ¶ 21, 761 A.2d at 300. We held that "[t]he power of the court to adjudicate such disputes and to enforce its own orders constitutes state involvement in a way that clearly implicates parents' fundamental liberty interests in the care and custody of their children." *Id.*[1]

[¶ 6]  Last year, in a guardianship appeal, we emphasized that:

> [W]e have consistently recognized, absent a showing of unfitness, parents' fundamental liberty interest with respect to the care, custody, and control of

---

1.  Citing *Connecticut v. Doehr*, 501 U.S. 1, 10–11, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991) (noting that prejudgment remedy statutes enable a party to utilize state procedures with the "overt, significant assistance of state officials," thereby involving state action substan-

tial enough to implicate the Due Process Clause); *see also Peralta v. Heights Med. Ctr., Inc.*, 485 U.S. 80, 85, 108 S.Ct. 896, 99 L.Ed.2d 75 (1988); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).

their children. *See Rideout,* 2000 ME 198, ¶ 18, 761 A.2d at 299; *Osier v. Osier,* 410 A.2d 1027, 1029 (Me.1980) (recognizing that "any decision terminating or limiting the right of a parent to physical custody of his child also affects his constitutionally protected liberty interest in maintaining his familial relationship with the child"); *Danforth v. State Dep't of Health & Welfare,* 303 A.2d 794, 797 (Me.1973) (discussing the natural and fundamental rights of parents to the custody of their children).

*Guardianship of Jeremiah T.,* 2009 ME 74, ¶ 27, 976 A.2d 955, 962.

[¶ 7] This year in *Jewel I,* we reviewed the issues that are before us again on this appeal as follows:

Title 18–A M.R.S. § 5–204(c) does not define the term "temporarily intolerable . . . living situation." 18–A M.R.S. § 5–204(c). Our construction of that term is informed, however, by the fundamental liberty interest parents have in parenting their children. *See Guardianship of Jeremiah T.,* 2009 ME 74, ¶ 27, 976 A.2d 955, 962. Because a temporarily intolerable living situation must relate to a parent's inability to care for the child, proof of parental unfitness is a required element to support the establishment of a guardianship over the parent's objection. *Id.* The statute's requirement of a "living situation . . . that is at least temporarily intolerable for the child even though the living situation does not rise to the level of jeopardy required for the final termination of parental rights," 18–A M.R.S. § 5–204(c), thus requires the court to find that the parent's inability to meet the child's needs constitutes an urgent reason that "may have a dramatic, and even traumatic, effect upon the child's well-being," *Rideout v. Riendeau,* 2000 ME 198, ¶ 26, 761 A.2d 291, 301, if the child lives with the parent.

Accordingly, a guardianship may only be ordered pursuant to section 5–204(c) if the court finds that (1) the parent is currently unable to meet the child's needs and that inability will have an effect on the child's well-being that may be dramatic, and even traumatic, if the child lives with the parent, and (2) the proposed guardian will provide a living situation that is in the best interest of the child. This standard is, as indicated in section 5–204(c), less stringent than the standard for finding jeopardy. *See* 22 M.R.S. § 4002(6) (2009). Although a temporarily intolerable living situation may arise from the physical condition of a parent's residence, it is by no means restricted to that circumstance.

*Jewel I,* 2010 ME 17, ¶¶ 12–13, 989 A.2d at 729–30.

[¶ 8] With this background, the law governing review of the Probate Court decision at issue in this appeal may be summarized as follows:

[¶ 9] First, the father has a fundamental liberty interest in parenting his child that may not be infringed simply by proof that a grandparent might provide a "better" living arrangement for the child.

[¶ 10] Second, because a temporarily intolerable living situation must relate to a parent's inability to care for the child, proof of parental unfitness is a required element to support the imposition of a guardianship over the parent's objection.

[¶ 11] Third, while the standard for proof of a temporarily intolerable living situation, 18–A M.R.S. § 5–204(c), may be less stringent than the standard for a finding of jeopardy, 22 M.R.S. § 4002(6) (2009), a guardianship may only be ordered, pursuant to section 5–204(c), if the court finds that: (1) the parent is unfit in that he is currently unable to meet the child's needs and that inability will have an

effect on the child's well-being that may be dramatic, and even traumatic, if the child lives with the parent; and (2) the proposed guardian will provide a living situation that is in the best interest of the child.

[¶ 12] Fourth, while section 5–204(c) states that the standard of proof may be less stringent than the standard for finding jeopardy, section 5–204(c) imposes on the guardianship petitioner the higher, clear and convincing evidence burden of proof to create in the fact-finder an "abiding conviction" that it is "highly probable" that facts sought to be proved are the correct view of the events. *See Taylor v. Comm'r of Mental Health & Mental Retardation,* 481 A.2d 139, 153 (Me.1984).

[¶ 13] Having stated the law that will govern our review, we proceed to consider the factual and legal issues in this appeal.

## II. CASE HISTORY

[¶ 14] Jewel M. was born in April 2005. The mother and father were divorced when Jewel was two years old. The mother was granted primary physical custody, and the father was granted rights of contact. After her parents separated, Jewel was exposed to domestic violence by the mother's boyfriend and another individual and may have been sexually abused by men while in her mother's care.

[¶ 15] On September 9, 2008, without notice to the father, the maternal grandmother filed two petitions in Probate Court: one for appointment as temporary guardian and the other as guardian of the child. The Probate Court appointed the grandmother as temporary guardian on September 17, 2008. The child was subsequently diagnosed with post-traumatic stress disorder and began weekly therapy with a therapist in the vicinity of the grandmother's residence in Biddeford.

[¶ 16] In January 2009, the father, a resident of Holden, filed a motion to dissolve the temporary guardianship. After a hearing on the father's motion and the grandmother's outstanding petition for guardianship, the Probate Court granted the grandmother's petition in April 2009. The Probate Court found the father's living situation "intolerable" because he: (1) lacked a parental rights order giving him the primary residential care of the child; (2) had had limited and inconsistent contact with the child; (3) had not arranged for a qualified therapist for the child near his home; and (4) had yet to establish through hair follicle drug testing that he was drug-free.

[¶ 17] The Probate Court's April 2009 order provided a plan for the child to transition to the father's care and custody if certain conditions were met. Thus, the Probate Court ordered that the court would terminate the guardianship and the father would have complete care, custody, and control of Jewel when the father provided proof that: (1) the District Court had approved an agreement, into which the parents had recently entered, to modify the father's and mother's parental rights judgment to provide that the father would have primary residential care of the child; (2) the father had procured a qualified therapist for the child near his home; and (3) the father had passed a hair follicle drug test. The court ordered a visitation schedule between the father and Jewel.

[¶ 18] In May 2009, the father appealed from the Probate Court's judgment granting the grandmother's petition for guardianship. On appeal, the father argued that the court erred in (1) finding that a temporarily intolerable living situation existed with respect to him, and (2) denominating the grandmother's guardianship as permanent when it was, in effect, temporary.

[¶ 19]  In July 2009, while the father's appeal was pending, the father, grandmother, and the child attended an intake session with a doctor at Acadia Hospital in Bangor for the purpose of transitioning the child from her therapist in the Biddeford area to a therapist near her father's residence in Holden.  The child was accepted for therapy at Acadia Hospital, but was put on a waiting list.  Follow-up appointments proved difficult because, under the court-ordered visitation schedule, the father had physical custody of the child only at times when the facility was not available for appointments.  The child was later scheduled for an appointment in September 2009, but the appointment was cancelled and not rescheduled.

[¶ 20]  The father asserts that the grandmother cancelled the therapy appointment.  The grandmother asserts that she contacted the assigned therapist and informed her that Jewel had been engaging in play therapy with her current therapist, and that the Bangor area therapist said she did not offer play therapy and suggested another therapist who was supposed to initiate setting up a new appointment.  Under either version, it is evident that the grandmother's initiative led to the cancellation of the September 2009 appointment.

[¶ 21]  We heard oral argument on the father's appeal in January 2010 and issued *Jewel I* on March 9, 2010.  We affirmed the court's finding that the father presented a temporarily intolerable living situation, basing our conclusion primarily on two of the Probate Court's findings as supported in the record: (1) no court order was then in effect granting the father the

right to Jewel's primary residential care, and (2) the father's limited and inconsistent contact with Jewel could result in trauma to Jewel if there were a sudden shift in her residence from her grandmother to her father.  *Jewel I*, 2010 ME 17, ¶¶ 15–16, 21, 989 A.2d at 730–31, 732.  Noting these findings, we held that there was a sufficient basis to extend the guardianship to allow for a transition in residence.  *Id.* ¶ 21, 989 A.2d at 732.  We also concluded that the father's failure to find a therapist for Jewel as of the April 2009 hearing was relevant to the temporarily intolerable living situation inquiry, but we noted that the finding, considered in isolation, "might not support a court concluding that a temporarily intolerable living situation exists under the unique circumstances of this case...." *Id.* ¶ 17, 989 A.2d at 731.

[¶ 22]  In conclusion on that issue, we stated:

Jewel's need for a slow, steady transition of increasing contact with the father, and the father's need to finalize his custody rights in the family matter and procure a therapist for Jewel, considered together, established a temporarily intolerable living situation.  If Jewel were placed immediately with the father without the opportunity for a transition and before the father could legally assert a right to custody superior to that of the mother, the resulting situation would be, as the court found, traumatic for Jewel and contrary to her well-being.

*Id.* ¶ 21, 989 A.2d at 732.[2]

[¶ 23]  We further held that, as a matter of law, the Probate Court's order established a temporary guardianship, rather

2.  We did modify the Probate Court's order, however, by striking the finding that evidence established a need for the father to prove through hair follicle testing that he was drug-free, concluding that the "total body of evidence" and other of the court's findings indicated an absence of proof that the father had a substance abuse problem. *Guardianship of Jewel M.*, 2010 ME 17, ¶ 20, 989 A.2d 726, 732.

than a permanent guardianship. *Id.* ¶ 24, 989 A.2d at 732–33. We modified the Probate Court's judgment to reflect the fact that the guardianship ordered was temporary. *Id.* Reflecting our understanding from review of the record, the briefs, and representations made at oral argument that the parties were cooperating in working toward a transition to full custody for the father, we stated at the conclusion of our decision that:

> Both parties represented at oral argument that the father's visitation had occurred as required by the court's judgment and that the father had been awarded residential care of Jewel by the District Court in the family matter. We expect that once the father has provided the Probate Court with the name of a licensed qualified therapist for Jewel, the court will terminate the guardianship and Jewel will be transferred to her father's custody without condition.

*Id.* ¶ 25, 989 A.2d at 733. The mandate was: "Judgment is modified in accordance with this opinion and, as modified, is affirmed." *Id.*

[¶ 24] Subsequent events quickly proved our understanding of the parties' cooperation mistaken. On the day our decision was published, the grandmother immediately, and in violation of the Probate Court's order, terminated the father's access to the child. We also take judicial notice, *see* M.R. Evid. 201, of District Court files indicating that subsequently the grandmother, using her standing as a guardian, has obtained temporary protection from abuse orders that have restricted or barred the father's access to his child, although that access is, presumably, authorized by an outstanding, valid parental rights order. *See Finn v. Lipman*, 526 A.2d 1380, 1381 (Me.1987) (holding that a court can take judicial notice of court records in other cases including pleadings and docket entries).

[¶ 25] On or about March 12, 2010, the father submitted a letter to the Probate Court, pursuant to *Jewel I*, stating that the father had "identified [a doctor] as the qualified, licensed therapist who will be working with [the child] prospectively."

[¶ 26] Our mandate in *Jewel I* was docketed in the Probate Court on March 29, 2010. On the same day, the grandmother filed a new petition for temporary guardianship of Jewel, asserting that the father had taken no action to engage a therapist for Jewel and that Jewel had reported that the father had abused her. The father filed a motion to dismiss the grandmother's petition for temporary guardianship, arguing that he had submitted the name of a qualified therapist to the Probate Court and had otherwise complied with *Jewel I*, that he was, therefore, entitled to custody of the child, and that the grandmother's allegations were barred by res judicata.

[¶ 27] On April 8, 2010, the Probate Court held a hearing to address the then-existing guardianship order as well as a testimonial hearing on the grandmother's new petition for a temporary guardianship. At the hearing, the court apparently first concluded, over the grandmother's objection, that the father had complied with the terms of the then-existing guardianship order and with *Jewel I* by providing the name of a therapist for Jewel, and that the court was obligated to terminate that temporary guardianship pursuant to *Jewel I*. Accordingly, the court terminated that order.

[¶ 28] The court then heard testimony as to the grandmother's new petition for a temporary guardianship. Although the grandmother had indisputably played a role in limiting follow-up visits to engage a Bangor area therapist, the grandmother

testified that the father had done nothing since the July 2009 intake session at Acadia Hospital to procure a therapist for Jewel, and, although the father had identified a therapist, the grandmother claimed that the identified therapist did not see patients and would not personally treat Jewel.

[¶ 29] The child's therapist in the Biddeford area did not appear at the hearing but was permitted to testify by phone, as she was on a trip. That therapist testified that she had engaged Jewel in weekly play therapy for eighteen months; that neither the father nor another therapist had contacted her about transitioning Jewel to another therapist; that it would be traumatic for Jewel if her treatment ended abruptly; and that it would be best for Jewel to have a slow and steady period of transition between her current and new therapists in order to develop trust with the new therapist. This last position about the need for a transition period was similar to the position taken at the April 2009 hearing, at which time the child's guardian ad litem had recommended a five-month transition period to full custody for the father. That transition period would have been completed in September or October of 2009.

[¶ 30] The therapist also testified that on that very day, April 8, 2010, apparently while preparing for her trip, she had engaged in a play therapy session with Jewel in which Jewel had disclosed, for the first time, that her father had sexually abused her. The therapist also claimed that in December 2009 and January 2010, Jewel disclosed to her incidents of physical abuse by the father, which the therapist was required to report. A case manager at Spurwink Services, a private contractor for the State, indicated that after a follow-up investigation, the December and January abuse allegations were not pursued further.[3]

[¶ 31] Responding to questions by the guardian ad litem and the child's mother, the therapist conceded that she was "really not at all" convinced that the father had actually committed the acts of abuse she had reported to the court, and that the child's statements could have been based on events that had occurred some time ago with individuals other than the father, or could have resulted from suggestions by the grandmother. The child's mother also indicated during her cross-examination of Jewel's therapist that the acts of physical abuse that Jewel had reported were similar to abuse that the grandmother had subjected the mother to when she was a child.

[¶ 32] The father testified that he intends to engage Jewel in therapy once he has custody of her, and that he had recently spoken to Acadia and confirmed that Jewel can receive treatment at that facility. He further testified that because the original intake evaluation is outdated, he must take the child on a weekday for a new evaluation. The father stated that he had been unable to obtain a new evaluation because the grandmother had prevented him from seeing Jewel since *Jewel I* was decided and because compliance with HIPAA laws inhibited his ability to initiate her therapy without the grandmother's presence. He argued that he was not unfit and there could be no intolerable living situation as a result of his not having

---

3. Spurwink Services opened an inquiry as a result of the reports that the father was abusive to or neglectful of Jewel, but the case was closed because the child was living with the grandmother. Despite these allegations, the father's unsupervised visitation with Jewel continued and, until the April 8 hearing, the grandmother never raised any concerns about the allegations directly with the father.

begun counseling for the child when he had not yet had the opportunity to do so.[4]

[¶ 33] After the hearing, the court entered an order appointing the father and the grandmother as temporary coguardians of the child. The court concluded that an intolerable living situation existed because "[i]t would be traumatic and not in Jewel's best interest for her to be in the full custody of her father without a transition in counseling," and that it would be in the child's best interest to appoint the father and grandmother as coguardians for not more than six months. The court awarded primary residence of Jewel to the father and grandmother for part of each week, respectively, and ordered that they facilitate the child's transition between counselors. The court's order provided that the court would review the matter on June 9, 2010, to assess whether the intolerable living situation had been alleviated and the temporary guardianship would be terminated.

[¶ 34] The findings in the court's order were sparse. However, we can infer that in making the father a coguardian and allowing Jewel to reside with him for part of each week, the court must have found that: (1) the grandmother had failed to meet her burden to prove that the father was an unfit parent; (2) it was not credible to attribute the reported physical or sexual abuse to the father; and (3) for at least part of each week, the grandmother had failed to prove that the father's living situation was intolerable.

[¶ 35] The father appealed from this judgment pursuant to 18–A M.R.S. § 1–308 (2009) and M.R.App. P. 1.

[¶ 36] After the father filed this appeal, the grandmother filed a complaint for protection from abuse on behalf of Jewel against the father on April 30, 2010. The District Court (Biddeford, *Foster, J.; Douglas, J.; Janelle, J.; O'Neil, J.*) granted four successive temporary protection from abuse orders, the first of which prohibited the father from having contact with Jewel and, contrary to the orders of the Probate Court and the District Court in the parental rights action, awarded exclusive temporary custody of Jewel to the grandmother. The second and third temporary protection from abuse orders awarded temporary custody of Jewel to the grandmother, but granted the father limited supervised visitation. The fourth order was to remain in effect until further order.

[¶ 37] The Probate Court was informed on June 8, 2010, of the temporary order for protection from abuse in place against the father and held the previously-scheduled hearing on June 9, 2010. It appears that there was a status conference, but no orders were issued as a result of the conference, and a case management conference was scheduled. It does not appear that the temporary guardianship at issue in this appeal has been terminated since the appeal was filed or that this appeal is otherwise moot. *See generally* M.R.App. P. 3(b); M.R. Civ. P. 62(a); M.R. Prob. P. 62.

## III. LEGAL ANALYSIS

### A. Res Judicata

[¶ 38] The father argues that, because the grandmother filed for, and was granted, a new appointment as temporary coguardian based on the same circumstances that were litigated when the

---

4. At the time of the hearing, the father was not working because he was caring for his wife who was undergoing chemotherapy treatments, but he believed this would not prevent his being able to meet Jewel's needs. The father also has a young son living with him, with whom Jewel has a good bond.

Probate Court granted her original petition for a guardianship, the court was barred by the doctrine of res judicata from granting, over the father's objection, the grandmother's subsequent petition for temporary guardianship. "We review de novo a determination that res judicata bars a particular litigation." *Portland Co. v. City of Portland*, 2009 ME 98, ¶ 22, 979 A.2d 1279, 1287.

[¶ 39] There are two branches of the res judicata doctrine, issue preclusion and claim preclusion. *Marin v. Marin*, 2002 ME 88, ¶ 7, 797 A.2d 1265, 1267. Issue preclusion, also known as collateral estoppel, "prevents the relitigation of factual issues already decided if the identical issue was determined by a prior final judgment, and ... the party estopped had a fair opportunity and incentive" in an earlier proceeding to present the same factual issue or issues it wishes to litigate again in a subsequent proceeding. *Macomber v. MacQuinn–Tweedie*, 2003 ME 121, ¶ 22, 834 A.2d 131, 138–39. "Collateral estoppel arises only if the identical issue necessarily was determined by a prior final judgment." *Id.* ¶ 25, 834 A.2d at 140 (quotation marks omitted).

[¶ 40] Claim preclusion bars the relitigation of claims if: (1) the same parties or their privies are involved in both actions; (2) a valid final judgment was entered in the prior action; and (3) the matters presented for decision in the second action were, or might have been, litigated in the first action. *Id.* ¶ 22, 834 A.2d at 139.

[¶ 41] Principles of res judicata must be applied with caution in domestic relations cases, as new developments often inform decisions as to what may be in the best interest of a child in circumstances where relationships must continue and will change over time until a child reaches majority. The issues raised by the grandmother in her new petition for temporary guardianship were based on events and circumstances arising subsequent to the establishment of the original guardianship, i.e., whether (1) given Jewel's current needs and events occurring since the previous guardianship was established, the child would benefit from a transitional period between her existing therapist and a new therapist she had yet to meet near her father's home; and (2) new allegations by the child of abuse or neglect by her father, even if unsubstantiated, warranted the establishment of a new temporary guardianship to take effect.

[¶ 42] The issues the grandmother raised in support of the petition for temporary guardianship at issue in this appeal, including our opinion in *Jewel I*, arose, at least in part, after the prior guardianship was established. Therefore, her petition was not barred, as a matter of law, by res judicata.

B. Failure to Follow the Law Court Mandate

[¶ 43] On remand, a trial court must adhere to our mandate and " 'effectuate the decision of the [C]ourt.' " *State v. Patterson*, 2005 ME 55, ¶ 9, 881 A.2d 649, 651 (quoting *Farnsworth v. Whiting*, 106 Me. 543, 546, 76 A. 942, 943 (1910)). In *Patterson*, we held that the trial court's failure on remand to " 'make clear its findings of fact and conclusions of law' " in disregard of this Court's decision and the party's request for specific findings constituted "an unsustainable exercise of its discretion." *Id.; cf. Estate of Voignier*, 638 A.2d 732, 733–34 (Me.1994) (holding that, on remand, the Probate Court did not fail to follow this Court's mandate).

[¶ 44] In this case, we affirmed the Probate Court's determination that a temporarily intolerable living situation existed

with respect to the father, finding that it was relevant, though possibly not sufficient in isolation, that the father had not yet found a qualified therapist in his area for Jewel. *Jewel I,* 2010 ME 17, ¶ 17, 989 A.2d at 731. We then stated in conclusion that "[w]e expect that once the father has provided the Probate Court with the name of a licensed qualified therapist for Jewel, the court will terminate the [then-existing] guardianship and Jewel will be transferred to her father's custody *without condition."* *Id.* ¶ 25, 989 A.2d at 733 (emphasis added). The mandate affirmed the court's judgment as modified in accordance with our opinion. *Id.*

[¶ 45] The Probate Court appeared to find that the father had complied with our decision in *Jewel I* because it terminated the guardianship then at issue. It then took up the new guardianship petition. We do not construe this action as violative of our mandate, although any further guardianship proceedings after this opinion should be precluded for reasons discussed below.

C. Sufficiency of the Evidence and the Probate Court's Findings

[¶ 46] The Probate Court purported to establish the temporary coguardianship at issue in this appeal pursuant to 18–A M.R.S. § 5–204(c), which provides, in relevant part, that guardians or coguardians may be appointed for an unmarried minor when the court finds, by clear and convincing evidence, that:

[A] living situation has been created that is at least temporarily intolerable for the child even though the living situation does not rise to the level of jeopardy required for the final termination of parental rights, and that the proposed guardian will provide a living situation that is in the best interest of the child.

18–A M.R.S. § 5–204(c); *see also* 18–A M.R.S. § 5–207(c) (2009); *In re Amberley D.,* 2001 ME 87, ¶ 19, 775 A.2d 1158, 1165. We held in *Jewel I* that a "temporarily intolerable living situation must relate to a parent's inability to care for the child" and that "proof of parental unfitness is a required element to support the establishment of a guardianship over the parent's objection." 2010 ME 17, ¶ 12, 989 A.2d at 729. Accordingly:

[A] guardianship may only be ordered pursuant to section 5–204(c) if the court finds that (1) the parent is currently unable to meet the child's needs and that inability will have an effect on the child's well-being that may be dramatic, and even traumatic, if the child lives with the parent, and (2) the proposed guardian will provide a living situation that is in the best interest of the child.

*Id.* ¶ 13, 989 A.2d at 730; *see also Guardianship of Jeremiah T.,* 2009 ME 74, ¶ 27, 976 A.2d at 962.

[¶ 47] On appeal, we review the Probate Court's findings for clear error. *In re Amberley D.,* 2001 ME 87, ¶ 20, 775 A.2d at 1165. Here, by appointing the father as a coguardian, the Probate Court necessarily concluded that the grandmother had failed to prove, to the clear and convincing evidence standard, that the father was an unfit parent. By allowing the child to reside with the father for part of each week, the Probate Court necessarily concluded that the grandmother had failed to prove, to the clear and convincing evidence standard, that the father's living situation was temporarily intolerable. With the grandmother having failed to prove these essential facts, her second petition for a temporary guardianship should have been denied.

[¶ 48] The Probate Court's judgment establishing the current temporary coguardianship appears to have been based on a

conclusion that a temporarily intolerable living situation had been created because "[i]t would be traumatic and not in Jewel's best interest for her to be in the full custody of her father without a transition in counseling." This was certainly a legitimate concern, and one that was applied in the April 2009 order to justify imposition of the guardianship at that time. Had the transition contemplated in April 2009 occurred, this case would have been long over. The record of the April 2010 hearing unequivocally establishes that, by her action, the grandmother prevented the counseling transition from occurring.

[¶ 49] The grandmother cannot prevail on her burden of proof to establish a temporary guardianship by creating the situation that prevents the father from establishing a new therapist for the child in the area where he lives. The court's finding and the evidence in the record do not support, to the clear and convincing evidence standard, the findings we have held are necessary to support imposition of a temporary guardianship and its invasion of a parent's fundamental liberty interest. The temporary guardianship awarded to the grandmother must be terminated immediately, as it is not supported on this record. The mandate shall issue immediately, without the usual fourteen-day waiting period.

[¶ 50] We conclude with one other observation on issues that have impacted this case. At the point that the Probate Court had terminated the original temporary guardianship in accordance with our opinion, the only operative order governing custody of the child was the District Court parental rights order. The District Court is the court with primary jurisdiction over actions involving domestic relations, parental rights, and children. 19–A M.R.S. § 103 (2009). The Probate Court recognized this jurisdiction, referencing the District Court parental rights order in its April 2009 decision. To keep all issues before the court with primary jurisdiction for domestic relations and parental rights issues, the appropriate remedy for a grandparent seeking access to a child against a parent's wishes should be a Grandparents Visitation Act action pursuant to 19–A M.R.S. §§ 1801–1805 (2009). This is the primary remedy the Legislature has established to resolve grandparent-parent disputes.

[¶ 51] While the Probate Court has authority to address grandparent-parent disputes pursuant to the guardianship statute, when there is an outstanding, valid parental rights order, as there is in this case, the Probate Court must, as a threshold matter, determine whether the grandparent should be required to exhaust the remedy provided by the Grandparents Visitation Act as prerequisite to proceeding on the guardianship petition. In this manner, the court recognizes the jurisdiction of the District Court under title 19–A and minimizes the possibility of separate, yet simultaneous proceedings involving the best interest of a child in two courts. Further, this threshold determination will enable the Probate Court to quickly dispose of marginal guardianship petitions in cases in which a grandparent visitation action can afford complete relief.

The entry is:

Judgment Vacated. Remanded to terminate the guardianship order. Mandate to issue forthwith.