2012 ME 126

**STATE of Maine**

**v.**

**Nicklas JONES.**

Supreme Judicial Court of Maine.

Argued:  Sept. 12, 2012.
Decided:  Nov. 8, 2012.

Matthew A. Hunter, Esq. (orally), Presque Isle, for appellant Nicklas Jones.

William J. Schneider, Attorney General, and Donald W. Macomber (orally), Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee State of Maine.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

LEVY, J.

[¶ 1] Nicklas Jones appeals from a judgment of conviction entered by the trial court (*Daigle, J.*) following his conditional guilty plea to manslaughter (Class A), 17–A M.R.S. § 203(1)(A) (2011). Jones contends that the court (*Cuddy, J.*) erred in denying his motion to suppress statements he made to police officers during the investigation of his infant daughter's death. Jones further contends that the Juvenile Court (Caribou, *Daigle, J.*) erred by admitting hearsay evidence during Jones's juvenile bind-over hearing. We disagree and affirm the judgment.

## I. BACKGROUND

[¶ 2] On April 23, 2009, Nicklas Jones and Danielle Fitts brought their daughter, then approximately three months old, to the hospital with serious injuries. As a result of her injuries, the baby died four days later. In connection with her hospitalization and death, detectives from the Maine State Police interrogated Jones on three separate occasions: first at the hospital, then at Jones's apartment, and finally at the Maine State Police barracks in Houlton. Jones eventually confessed to throwing his infant daughter against her crib immediately prior to her hospitalization, which led to his conditional guilty plea.

A. The Interrogation at the Hospital

[¶ 3] At the hospital, Detective Dale Keegan, dressed in plain clothes, asked Jones for permission to speak with him. Det. Keegan told Jones not to "panic," and that it was "the rules" in Maine that "[a]ny time a child under five comes into a hospital very ill, we [the police] have to come." Jones agreed to talk to Det. Keegan, and Det. Keegan led Jones to a private room.

[¶ 4] Shortly after entering the room, Det. Keegan learned that the door leading back to the emergency room was locked, and he told this to Jones. There was another door leading to the waiting room, which was not locked, and both Det. Keegan and Jones eventually exited through this unlocked door.

[¶ 5] Det. Keegan proceeded to question Jones about his relationship with Fitts and his work and educational background. About thirteen minutes into the interrogation, Jones's mother knocked on the door. Det. Keegan told Jones's mother that he was with the state police and that it was routine for the police to investigate injuries to children under five years old. She responded "absolutely, absolutely" and left the room. A few minutes later, Det. Keegan learned that Jones was seventeen—not eighteen as he had thought—and Det. Keegan asked Jones if he wanted his mother in the room. Jones said no.

[¶ 6] Eventually, Det. Keegan asked Jones to tell him what had happened that day. Jones replied that he had been holding the baby with one arm, preparing to put her in her crib, when she "jump[ed] backwards" and "she fell and she hit the crib and then she fell and hit the floor." Det. Keegan asked if anything else had happened, emphasizing that they needed to know to properly treat the baby's injuries. Det. Keegan asked Jones if he had shaken the baby, or if there had been a violent blow. Jones said no. Det. Keegan ended the interrogation after approximately thirty minutes.

B. The Interrogation at Jones's Apartment

[¶ 7] Before leaving the hospital, Jones agreed to allow detectives to make a video recording of him reenacting what had happened to the baby in his apartment. In the early hours of the following morning, Det. Keegan and two other plainclothes

detectives arrived at the apartment Jones shared with Fitts. Det. Keegan asked Jones's mother if she would wait outside during the reenactment, and she said it was up to Jones. Jones agreed to have his mother wait outside. The detectives set up a video camera, and Jones reenacted his version of the events, which was consistent with his earlier description. The reenactment lasted approximately six minutes, after which one of the detectives left the apartment.

[¶ 8] Det. Keegan and a second detective remained. Det. Keegan told Jones that the other officers had discovered marijuana roaches and some marijuana plants in the apartment, but the detective indicated to Jones that he did not care, and the issue did not come up again. Instead, the two detectives asked Jones about his relationship with Fitts, his stress level, and his family life.

[¶ 9] After several minutes, Det. Keegan told Jones that the medical team had determined that the baby's injuries were "non-accidental." Det. Keegan suggested that Jones might have shaken the baby, but Jones maintained that the baby had fallen as he previously described. The detectives told Jones that they did not believe him, but Jones maintained that he was being truthful. Including the reenactment, the second interrogation lasted approximately seventy-eight minutes.

## C. Interrogation at the Maine State Police Barracks in Houlton

[¶ 10] The baby died from her injuries four days after her initial hospitalization. After her death, Det. Keegan contacted Jones and his mother to ask if they could meet to go over the autopsy results. Jones needed to go to Bangor for an unrelated appointment, and he and his mother agreed to stop by the barracks, which were on the way.

[¶ 11] At the beginning of the interrogation at the barracks, Det. Keegan told Jones and his mother that they were not required to speak, and that they could leave at any time. Det. Keegan explained that the door to the interview room was closed for privacy but was not locked. There was only one other officer in the room, both officers were dressed in plain clothes, and Jones's mother was present throughout the interrogation.

[¶ 12] The detectives began by describing what they had learned from the medical team. The detectives repeatedly told Jones that they did not believe his version of events, and that they believed he had harmed the baby. After approximately fifty-two minutes, Jones's mother said that they needed some air, and she and Jones left the room. They returned about ten minutes later, and the interrogation continued in the same manner as before. Then, Jones's mother said, "I think we'd like to get an attorney." Det. Keegan acknowledged the request for an attorney, clarified that Jones was not under arrest, said that he would stop the interrogation, and told Jones that he could come back to talk to them at any time. After several minutes, Jones left the room to sit outside in his mother's car, but his mother agreed to remain to speak with the detectives.

[¶ 13] Det. Keegan suggested to Jones's mother that she talk to Jones alone, to encourage him to tell the truth, and that they come back in if Jones wanted to talk more. She agreed, went to talk to Jones, and returned alone, emotional and crying. Jones's mother told the detectives that Jones had admitted that he had harmed the baby, and that Jones was hysterical in the car. The detectives suggested to Jones's mother that she tell Jones that the detectives were still willing to listen, and she agreed.

[¶ 14] About ten minutes later, without further prompting, Jones and his mother returned to speak to the detectives. Det. Keegan reiterated that Jones was not under arrest and did not have to speak with them. Jones then admitted that he "threw [the baby] into the crib" and "she hit her head off of the side of the crib." The entire interrogation, including the ten-minute break and the fifty-eight minutes Jones spent outside in his mother's car, lasted approximately three hours.

### D. Bind-over Hearing

[¶ 15] The State filed a juvenile petition charging Jones with manslaughter (Class A), 17–A M.R.S. § 203(1)(A), on May 4, 2009, in the District Court. In July, the State moved to bind Jones over pursuant to 15 M.R.S. § 3101(4) (2011), requesting that the Juvenile Court waive its jurisdiction over Jones and permit the State to prosecute Jones as an adult. The Juvenile Court held a bind-over hearing on April 30 and May 3, 2010. The only issue at the hearing was whether it was appropriate to prosecute Jones as an adult.

[¶ 16] The court heard testimony from several witnesses, including Lawrence Austin, Deputy Superintendent for Operations at the Mountain View Development Center, a youth detention facility, who testified for the State. Austin related information he had learned from staff members at Mountain View who worked with Jones during his pretrial detention. Jones objected to this testimony on the grounds that the hearsay was of "suspect" credibility. The court overruled the objection. On May 14, 2010, the court ordered Jones bound over to the Superior Court to be prosecuted as an adult.

### E. Superior Court

[¶ 17] In the Superior Court, Jones filed a motion to suppress his statements to the police. Jones alleged that because he was subject to custodial interrogations, the police were required to give him *Miranda* warnings and to cease questioning after he requested an attorney. The motion also asserted that Jones's statements to the detectives were not voluntary because the detectives' questioning "did not comport with due process." After a hearing, the court (*Cuddy, J.*) denied the motion.[1]

[¶ 18] Jones withdrew his earlier plea of not guilty and entered a conditional plea of guilty to manslaughter, as provided for in M.R.Crim. P. 11(a)(2), which preserved his right to appeal from the Superior Court's order denying his motion to suppress evidence and from the Juvenile Court's order binding him over to be tried as an adult. The court (*Daigle, J.*) sentenced Jones to fifteen years of imprisonment with all but six years suspended, with four years of probation and credit for time served. This timely appeal followed.

## II. DISCUSSION

### A. The Superior Court's Denial of Jones's Motion to Suppress

[¶ 19] Jones contends that the Superior Court erred in denying his motion to suppress, because (1) he did not receive *Miranda* warnings, (2) the court failed to consider his status as a juvenile as part of its custody analysis, and (3) his statements were not voluntary. We consider each contention in turn.

---

**1.** The docket record for the Superior Court incorrectly indicates that the motion was granted.

### 1. *Miranda*

█ [¶ 20] "Statements made during a custodial interrogation are admissible only if the person making the statements has been advised of the rights referred to in *Miranda v. Arizona.*" *State v. Prescott,* 2012 ME 96, ¶ 9, 48 A.3d 218 (quotation marks omitted). The State concedes that each of the three interactions between Jones and the police were interrogations, and that the police did not provide Jones with *Miranda* warnings. The sole *Miranda* issue, then, is whether the Superior Court erred in concluding that Jones was not in custody during each of his three interrogations.

█ [¶ 21] "The determination of whether an individual was in custody is a mixed question of fact and law." *State v. Bridges,* 2003 ME 103, ¶ 25, 829 A.2d 247 (citing *Thompson v. Keohane,* 516 U.S. 99, 112–13, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995)). In reviewing a court's custody determination, we defer to the court's factual determinations, but we review de novo the determination of whether an individual was in custody. *See Prescott,* 2012 ME 96, ¶ 10, 48 A.3d 218.

█ [¶ 22] An interrogation is custodial if "a reasonable person standing in the shoes of [the defendant] would have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* (quotation marks omitted). In making this objective determination, a court may consider a number of factors, including

(1) the locale where the defendant made the statements;

(2) the party who initiated the contact;

(3) the existence or non-existence of probable cause to arrest (to the extent communicated to the defendant);

(4) subjective views, beliefs, or intent that the police manifested to the defendant, to the extent they would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(5) subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(6) the focus of the investigation (as a reasonable person in the defendant's position would perceive it);

(7) whether the suspect was questioned in familiar surroundings;

(8) the number of law enforcement officers present;

(9) the degree of physical restraint placed upon the suspect; and

(10) the duration and character of the interrogation.

*State v. Michaud,* 1998 ME 251, ¶ 4, 724 A.2d 1222. We consider these factors "in their totality, not in isolation." *Prescott,* 2012 ME 96, ¶ 11, 48 A.3d 218.

█ [¶ 23] The *Michaud* factors inform our conclusion that a reasonable person in Jones's position would have felt free to leave each of the three interrogations. The first interrogation was brief and took place at a neutral location. Although initiated by a detective, the interrogation was non-confrontational: only a single detective was present, he was dressed in plain clothes, he asked to speak with Jones rather than demanding to speak with him, and he gave Jones the option to have his mother in the room during questioning.[2]

---

2. Parental consent is not required for the police to interrogate a juvenile who has not been arrested; it is only one factor in the totality-of-the-circumstances analysis used when making a determination regarding custody. *See J.D.B. v. North Carolina,* —— U.S.

Throughout the interrogation, the detective never indicated to Jones that a crime had been committed, much less that there was probable cause to arrest. Instead, the detective emphasized the routine nature of the interrogation, and that the focus of the interrogation was to aid the doctors in the baby's medical treatment. And although one of the doors to the room where Jones was questioned was locked, Jones was not restrained because there was another door that was unlocked.

[¶ 24] The second interrogation, at Jones's apartment, was similarly non-confrontational: it took place in surroundings familiar to Jones, the detectives were in plain clothes, and Jones had the option of having his mother present. The interrogation took well under two hours, and Jones was not restrained in any way. Although the detectives mentioned that they had found marijuana in the apartment, they immediately dropped the subject and did not indicate that it might be cause for arrest. And although the detectives indicated to Jones that they believed Jones was not being truthful about his role in the baby's injuries, given the totality of the circumstances, a reasonable person in Jones's position would have felt free to leave. *See California v. Beheler,* 463 U.S. 1121, 1124 n. 2, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (noting that the Supreme Court had previously "rejected the notion that the 'in custody' requirement was satisfied merely because the police interviewed

a person who was the 'focus' of a criminal investigation").

[¶ 25] Similarly, a reasonable person in Jones's position would have felt free to leave the third interrogation. The detectives repeatedly told Jones that he was free to leave, was not under arrest, and did not have to speak to them, and they honored his requests to take a break and to leave the room. *Cf. Bridges,* 2003 ME 103, ¶¶ 31, 32, 36, 829 A.2d 247 (finding custody where, among other factors, detectives told defendant she did not have to talk to them, but then told defendant that she "needed to sit there . . . and tell the truth" (omission in original)). Jones was not restrained in any way, and in fact took a ten-minute break and spent nearly an hour outside the barracks, waiting for his mother in her car. *Cf. id.* ¶¶ 6, 35, 36 (finding custody where, among other factors, defendant was driven to police station by her mother, but her mother left, the defendant had no independent transportation, and it was January and she was without shoes). Although the questioning took place at the police barracks, that fact alone does not give rise to a finding of custody within the meaning of *Miranda. See, e.g., State v. Poblete,* 2010 ME 37, 123, 993 A.2d 1104. That is especially true where, as here, the surroundings were made more familiar by the presence of Jones's mother and the fact that the detectives wore plain clothes.

[¶ 26] Because a reasonable person in Jones's position would have felt free to terminate and leave each of the three in-

---

——, 131 S.Ct. 2394, 2399, 2408, 180 L.Ed.2d 310 (2011) (noting that neither school administrators nor police officers contacted a thirteen-year-old student's legal guardian before interrogating the juvenile at school, but drawing no conclusion from this evidence alone and remanding the case to determine custody); *see also State v. Ann Marie C.,* 407 A.2d 715, 725 (Me.1979) (concluding that neither the federal nor state constitution imposes "a

*per se* requirement that a juvenile be accorded the counsel of a parent or other adult before she can knowingly and voluntarily waive her *Miranda* rights"), *overruled on other grounds by State v. Cloutier,* 678 A.2d 1040, 1042 (Me. 1996); *but see* 15 M.R.S. § 3203–A(2–A) (2011) (stating rules for notification and consent of a legal custodian prior to the interrogation of an arrested juvenile).

terrogations, at no point during those interrogations was Jones in custody within the meaning of *Miranda*. *See Prescott*, 2012 ME 96, ¶ 10, 48 A.3d 218. As such, any statements made by Jones during those interrogations are not subject to the requirements of *Miranda*, and are therefore not excludable on those grounds. *See id.* ¶ 9.

### 2. Relationship Between an Offender's Juvenile Status and "Custody"

[¶ 27] Jones further contends, however, that the court erred by failing to expressly state in its order denying his suppression motion that it had factored Jones's juvenile status into its custody analysis, in violation of *J.D.B. v. North Carolina*, — U.S. —, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011).

[¶ 28] In *J.D.B.*, the Supreme Court held that a court must consider a juvenile suspect's age when determining if the suspect is in custody for purposes of *Miranda*. *See id.* at 2399. However, the factors informing a custody analysis are considered "in their totality, not in isolation," *see Prescott*, 2012 ME 96, ¶ 11, 48 A.3d 218, and a child's age will not always "be a determinative, or even a significant, factor in every case," *J.D.B.*, 131 S.Ct. at 2406.

[¶ 29] In its order, although the court explicitly noted that Jones was a juvenile at the time of the offense, it did not expressly address that status as part of its custody analysis. Where, as here, there was no motion for further findings pursuant to M.R.Crim. P. 41A(d), "we will infer that the court found all the facts necessary to support its judgment if those inferred findings are supportable by evidence in the record." *State v. Connor*, 2009 ME 91, ¶ 9, 977 A.2d 1003.

[¶ 30] There is ample record evidence to suggest that the court considered Jones's age in its custody analysis, but found it to be an insignificant factor. *See J.D.B.*, 131 S.Ct. at 2406. At the time of the interrogations, Jones was seventeen years old and had been living on his own with his girlfriend and child. He also declined to have his mother present during the first two interrogations. Thus, despite Jones's status as a juvenile, he was functioning in the world as an adult, and there is no basis to treat his age as a significant factor in a custody analysis. *See id.* ("[T]eenagers nearing the age of majority are likely to react to an interrogation as would a typical 18–year–old in similar circumstances." (quotation marks omitted)). Because there was no motion for further findings pursuant to M.R.Crim. P. 41A(d), we infer that the court made this finding, and thus properly considered Jones's juvenile status. *See* M.R.Crim. P. 41A(d); *J.D.B.*, 131 S.Ct. at 2399; *Connor*, 2009 ME 91, ¶ 9, 977 A.2d 1003.

### 3. Voluntariness

[¶ 31] "A confession is admissible in evidence only if it is voluntary." *State v. Dion*, 2007 ME 87, ¶ 33, 928 A.2d 746. "The determination of whether a confession is voluntary is a mixed question of fact and law; a court's factual findings are reviewed deferentially for clear error, but the application of legal principles to those findings is reviewed de novo." *Id.* ¶ 32 (emphasis omitted).

[¶ 32] A voluntary confession is one that "is the result of [a] defendant's exercise of his own free will and rational intellect." *State v. George*, 2012 ME 64, ¶ 20, 52 A.3d 903 (quotation marks omitted). To determine whether a defendant has exercised his own free will, we consider the totality of the circumstances. *See id.* ¶ 21. Among the factors we consider are

the details of the interrogation; duration of the interrogation; location of the in-

terrogation; whether the interrogation was custodial; the recitation of *Miranda* warnings; the number of officers involved; the persistence of the officers; police trickery; threats, promises or inducements made to the defendant; and the defendant's age, physical and mental health, emotional stability, and conduct.

*Id.* (quotation marks omitted).

[¶ 33] The court did not err in concluding that Jones's confession was voluntary. The interrogations were non-custodial, and during those interrogations, the detectives did not threaten Jones, promise him leniency, or deceive him. Although Jones was a juvenile at the time of the interrogations, he was nearly eighteen, and his mother was present or available to him for all of the interrogations. During the first two interrogations, Jones was clearly tired and concerned for his daughter, but he was not overly emotional, his responses were at all times coherent, and the interrogations did not last very long. During the third and final interrogation, Jones was, at times, highly emotional, but there is no indication that the detectives unreasonably took advantage of his emotions, or that his emotions interfered with his ability to make rational judgments. Jones's conduct also suggests that his statements were voluntary. Over the course of the interrogation, Jones left the room twice to take breaks, for a total of more than an hour, but chose to return both times. Based on the conduct of the detectives and Jones's age, emotional state, and conduct, the court did not err in concluding that Jones's statements were voluntary. *See id.* ¶¶ 20–21.

### B. The Admission of Hearsay Evidence in the Bind-over Hearing

[¶ 34] Jones contends that the Juvenile Court violated his constitutional right to due process of law by relying on the testimony of Lawrence Austin in its decision to bind him over to the Superior Court. Austin, the Deputy Superintendent for Operations at the Mountain View Development Center, testified about reports he received from other staff members regarding Jones's progress at the detention facility and Jones's disciplinary record. Jones rightly concedes that the Maine Rules of Evidence do not apply in this instance, but asserts that the court's reliance on the hearsay was error because the hearsay was unreliable.[3]

[¶ 35] Our review of an alleged constitutional violation is de novo. *Malenko v. Handrahan,* 2009 ME 96, ¶ 21, 979 A.2d 1269. "Due process is a flexible concept calling for such procedural protections as the particular situation demands." *Bog Lake Co. v. Town of Northfield,* 2008 ME 37, ¶ 10, 942 A.2d 700 (quotation marks omitted). To determine what process a particular situation demands, "we look to three factors: (1) the private interest at stake; (2) the risk of error inherent

---

**3.** Although the Maine Rules of Evidence generally restrict the use of hearsay evidence, *see* M.R. Evid. 802, the rules of evidence do not apply to all portions of a bind-over hearing. A bind-over hearing comprises two discrete issues: first, whether there is probable cause to believe that the juvenile committed a juvenile crime "that would constitute murder or a Class A, Class B or Class C crime if the juvenile involved were an adult"; and second, whether "it is appropriate to prosecute the juvenile as if the juvenile were an adult." 15 M.R.S. § 3101(4)(E) (2011). By statute, "[t]he Maine Rules of Evidence shall apply *only* to the probable cause portion of the bind-over hearing," and therefore do not apply to the portion of the bind-over hearing addressing appropriateness. 15 M.R.S. § 3101(4)(B) (2011) (emphasis added). Because the hearsay evidence at issue here arose during the portion of the bind-over hearing addressing appropriateness, the rules of evidence do not apply. *See id.*

in the procedure; and (3) the government interest in the procedure." *Doe v. Graham*, 2009 ME 88, ¶ 23, 977 A.2d 391 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).

[¶ 36] We have previously considered what process is due a juvenile in a bind-over hearing. *See State v. Rosado*, 669 A.2d 180, 182–83 (Me.1996). In *Rosado*, we considered whether using the "preponderance of the evidence" burden of proof in a bind-over hearing satisfied a juvenile's right to due process, and concluded that it did. *See id.* at 183. With regard to the first *Eldridge* factor, we concluded that a bind-over hearing involves "no compelling or fundamental right of the juvenile ... other than exposure to the potential for a longer sentence." *Id.* We reasoned that a bind-over hearing involves no final adjudication of rights, does not directly deprive a juvenile of liberty, and does not foreclose the possibility of rehabilitation for the juvenile. *See id.* With regard to the third *Eldridge* factor, we concluded that the State has a "vital interest in controlling serious crime by treating a juvenile as an adult when it is found there is probable cause that the juvenile has committed an adult crime." *Id.* These two factors suggest that in a bind-over hearing, there will be no due process violation unless the second factor—the risk of error inherent in the procedure—is great.

[¶ 37] When a court admits hearsay evidence in a bind-over hearing, it does, to some degree, increase the risk that the court will rely on unreliable information and make an erroneous decision to bind over a juvenile.[4] However, that risk is small where the proffered evidence is reliable. *See State v. James*, 2002 ME 86,

¶¶ 12, 13, 797 A.2d 732 (concluding that admission of reliable hearsay evidence at a probation revocation hearing would not violate due process). Proffered hearsay is presumptively reliable if it is admissible under the rules of evidence. *See id.* ¶ 14. Even hearsay evidence that is properly excluded under the rules of evidence may be treated as reliable where "it is the kind of evidence upon which reasonable persons are accustomed to rely in the conduct of serious affairs." *Id.* ¶ 13 & n. 12 (citing 5 M.R.S.A. § 9057(2) (2002) (stating the rule for admissibility of evidence in an administrative adjudicatory proceeding)).

[¶ 38] The court did not err by treating Austin's hearsay testimony as reliable. It can reasonably be inferred from Austin's testimony that the staff reports in question were made in the regular course of the Center's operations. Detailed reports routinely prepared by staff regarding the activities and progress of juveniles held at a youth detention center are precisely the kind of information on which a reasonable person in Austin's supervisory position would customarily rely. Further, there is no suggestion that the staff members were biased or had a motive to fabricate, or that there was some other reason to treat the substantive reliability of the reports as highly suspect. *See James*, 2002 ME 86, ¶ 13, 797 A.2d 732. As such, the hearsay was reliable, and its admission was not error. *See Doe*, 2009 ME 88, ¶ 23, 977 A.2d 391.

The entry is:

Judgment affirmed.

---

4. In *State v. Rosado*, 669 A.2d 180, 182 (Me. 1996), we suggested that the second *Eldridge* factor involves "not the statistical probability of the occurrence of judicial error but the seriousness of the consequences of judicial error." Although both considerations are relevant, the central focus of the second *Eldridge* factor is the probability that a judicial error may occur. *See, e.g., Doe v. Graham*, 2009 ME 88, ¶¶ 23, 24, 977 A.2d 391.