MAINE SUPREME JUDICIAL COURT                                Reporter of Decisions
Decision:     2018 ME 96
Docket:       Ken-18-8
Argued:       May 16, 2018
Decided:      July 12, 2018

Panel:        SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

IN RE CHILDREN OF BETHMARIE R.

HUMPHREY, J.

[¶1]  Bethmarie R. appeals from a judgment entered by the District Court (Waterville, *Stanfill, J.*) finding jeopardy to two of her children pursuant to 22 M.R.S. § 4035 (2017) and ordering the Department of Health and Human Services (the Department) to cease reunification efforts pursuant to 22 M.R.S. § 4041(2)(A-2) (2017).  The mother contends that (1) the court erred when it concluded that the doctrine of res judicata did not bind the Department to orders issued by the Probate Court concluding that the children were not in jeopardy, and (2) her due process rights were violated.  We affirm the judgment.

## I. CASE HISTORY

[¶2]  The record contains the following procedural history.[1]  In January 2010, the Somerset County Probate Court (*Alsop, J.*) granted the mother's petition to appoint the maternal grandmother to be full guardian of the two children at issue in this case.  Between 2010 and 2016, the mother filed four petitions to terminate the guardianship.  The first two petitions were denied, and on the third petition, the court limited the guardianship to allow contact and permit the mother to participate in decision-making for the children.

[¶3]  During a supervised visit in August 2013, the mother absconded with the children and they were located near the South Carolina and Georgia border the next day.  The mother was convicted of two counts of criminal restraint in February 2015 in the Superior Court (Kennebec County, *Horton, J.*) and sentenced to two and one-half years' imprisonment, with all but five months suspended.

[¶4]  In June 2016, following a series of motions and orders concerning visitation, the mother filed her fourth petition in the Probate Court to terminate the guardianship.  On August 18, 2017, the Kennebec County Probate Court

---

[1]  The procedural history is drawn from the records of the District Court and the Probate Court. We may take judicial notice of the Probate Court's records, including the pleadings and docket entries. *See Guardianship of Jewel M.,* 2010 ME 80, ¶ 24, 2 A.3d 301; M.R. Evid. 201.

(*E. Mitchell, J.*)[2] held a final hearing on the mother's petition and on motions she filed to enforce and compel visitation. In an August 28, 2017, order, the court concluded that it could not find the mother unfit and terminated the guardianship, subject to a one-month transition of the children to the mother's custody.

[¶5] On September 1, 2017, the grandmother filed a motion to reopen the evidence, for amended findings of fact and conclusions of law, and to stay enforcement based on four alleged incidents that had occurred since the August 18 hearing: (1) the mother's former boyfriend[3] was seen near the mother's house, (2) the mother bit her son, (3) the mother sat by and did not intervene while another child stomped on her son's head, and (4) the mother pulled bandages off of her son's face in a way that inflicted unnecessary pain to the child. The mother filed a motion for contempt that same day, alleging that the grandmother was not complying with the August 28, 2017, order for contact.

---

[2] The matter was transferred from the Somerset County Probate Court to the Kennebec County Probate Court in August 2016.

[3] In March 2013, the grandmother, on behalf of the children, had petitioned the District Court for protection from harassment orders against this boyfriend, and the court (Waterville, *Dow, J.*) ordered protection after a hearing in July 2013. The protection order expired in July 2014.

4

[¶6]  On September 28, 2017, the Probate Court held a hearing on the new evidence and the issues raised by the motions.  A Department caseworker testified at the hearing, but it is not clear whether and to what extent the Probate Court received information from the Department concerning the mother.[4]  The following day, the court entered an intermediate order requiring supervised visits with the mother.

[¶7]  On Saturday, October 7, 2017, before the Probate Court issued a final decision, the Department sought, and the District Court (Augusta, *Ende, J.*) granted, a preliminary protection order pursuant to the Child and Family Services and Child Protection Act, 22 M.R.S. §§ 4001 to 4099-H (2017).  In its order, the District Court granted custody to the grandmother, ordered no contact with the mother, and relieved the Department of providing reunification services.  Pursuant to M.R. Civ. P. 126 and 4 M.R.S. §§ 152(5-A), 251-A (2017), the District Court (Waterville, *Stanfill, J.*) conferenced with the Probate Court and determined that, because the Probate Court had already heard the pending motions and soon would issue its judgment, the probate

---

[4] Although the Probate Court record indicates that the guardian ad litem reviewed a Department file concerning a 2012 child protection matter, that proceeding was in regard to one of the mother's other children.  Further, there is no indication in the record that the Probate Court issued a Clifford Order, 22 M.R.S. § 4008(3)(B) (2017), to obtain the Department's records concerning the children at issue.

matter would be transferred to the Waterville District Court after the Probate Court issued its amended order on the mother's motion to terminate the guardianship. After conferencing with the parties, the District Court continued the child protection hearing until November because it would be "impracticable to hold a summary preliminary hearing at this stage."

[¶8] On October 18, 2017, the Probate Court denied the mother's motion to terminate the guardianship,[5] "but add[ed] limitations to" the guardianship to require supervised visits with the mother at least twice weekly, ordered transitional services, and ordered the guardianship to be further reviewed after three months. The court emphasized that the grandmother had "consistently refused to work toward reunification of the children with their mother," "willfully ignored this court's initial order and [] made a transition beneficial to the children impossible by refusing to allow the children to follow the scheduled visits," did not present "convincing evidence on her four allegations against [the mother]," and did not present "evidence that suggested

---

[5] In its order, the Probate Court stated that "[a]t no point during this case did this court hear evidence that suggested 'circumstances of jeopardy to the children's health and welfare.'" Because the court did not terminate the guardianship, however, it had to have determined that the mother was unfit in some way. *See* 18-A M.R.S. § 5-212 (2017); *Guardianship of Stevens*, 2014 ME 25, ¶ 14, 86 A.3d 1197.

6

circumstances of jeopardy to the children's health and welfare." (Quotation marks omitted.)

[¶9] On November 8[6] and 16, 2017, a few weeks after the Probate Court order was issued, the District Court (Waterville, *Stanfill, J.*) held a combined summary preliminary hearing and jeopardy hearing. The District Court found jeopardy, *see* 22 M.R.S. § 4035(2) (2017), and issued an order on the Department's petition on December 21, 2017. The District Court's jeopardy determination relied in part on the biting, stomping, and bandage allegations that the Probate Court heard and adjudicated in its October 18, 2017, judgment. In stark contrast to the Probate Court's order for transitional services to return the children to the mother's care, the District Court ordered the Department to cease reunification with the mother based on the aggravating factor that the mother had subjected the children to treatment that was "heinous or abhorrent to society" because she had been convicted of criminally restraining these children and had abandoned her other children, 22 M.R.S. § 4002(1-B)(A)(1)

---

[6] At the hearing on November 8, 2017, the preliminary protection order was amended to grant custody to the Department after the grandmother voluntarily relinquished her guardianship. The grandmother was thereafter granted intervenor status in the child protection proceedings. *See* 22 M.R.S. § 4005-D(5) (2017).

(2017).[7] The permanency plan identified by the District Court was termination of the mother's rights and adoption by the grandmother.

[¶10] Based on the evidence before the District Court, the court made the following findings of fact to support its jeopardy determination:

> [The mother] has a number of children, none of whom are in her custody. [The children] have lived with [their grandmother] since 2009, which is most of their lives. Although their contact and visits with [their mother] have waxed and waned over the years, the children have not been in the primary care of their mother for over eight years.
>
> The last time [the mother] got close to regaining custody was in 2013. She was regularly seeing the children under a transition plan. For reasons unknown to this court, she decided to abscond with the children from a supervised visit. . . . Although the children were physically unharmed, the "kidnapping" continues to loom large in their minds, especially for [the boy].
>
> The children began to transition again to their mother this summer and were having regular visits. However, once again events occurred which halted the transition. The behaviors of the children after visits were concerning. [The girl], who is typically a shy and quiet girl, became increasingly angry, defiant and agitated after visits. [The boy] did not want to go, saying he was afraid his mother would take them again where no one would ever find them. . . .
>
> . . . .
>
> [The girl] was coming home from visits with her mother saying things to [the grandmother] like "you hate me and my

---

[7] The District Court order also cites 22 M.R.S. § 4002(1-B)(D) (2017), but the court's analysis leading to the finding makes clear that this was a clerical error.

mother," "I don't have to listen to you," "you're a decrepit old Nana," and denying [the boy] is her brother. [The girl's] behaviors culminated in the beginning of October when she became violent and threatening and taken into crisis. [The grandmother's ex-husband,] who remains very involved with the family[,] found that [the girl] had a tape recorder hidden in her shirt. [The girl] reported that she got it from [the mother] in order to record the conversations at the [grandmother's] home. [The grandmother's ex-husband] took it away, and [the girl's] behavior escalated. . . .

. . . .

[A psychologist] evaluated [the mother] in 2011, diagnosing her with a personality disorder with paranoid features as well as an adjustment disorder. He noted at the time her pattern of self-defeating behaviors, her inability to do what needed to be done to get her children back. After reviewing documents concerning recent events, he felt that her actions continue to be consistent with his 2011 evaluation: she still does not understand the issues or demonstrate any insight, she has not accepted services, and she continues her self-defeating behaviors. [The psychologist's] testimony and opinions are consistent with [the mother's] presentation in court. Her affect in the court was flat, demonstrating no emotion. She seemed incapable of understanding a viewpoint different from her own, of understanding the risks and benefits of different courses of action, or of even making decisions. She has her long-held views and sees no reason to even consider services or change.

The testimony of the children's therapist and of the Guardian ad litem ultimately is very persuasive to this court. [The therapist] has been seeing the children in therapy since 2015. The children ordinarily function quite well, until they are stressed by the visits with their mother. During the stress of visits and reunification, their behaviors become problematic. [The girl] becomes angry, threatening and yells. [The boy's] anxiety increases and he has sleep difficulties. Even though they were not physically harmed when [the mother] illegally took the children, there has never been

any resolution of this for the children. They worry that it will happen again. [The grandmother] has provided stability and consistency, and they feel safer with her. Such uncertainty is not healthy for the children, and their behaviors speak volumes.

The court has no question that [the grandmother and her ex-husband] have frequently involved the children in the conflict and adult issues, and have not always followed through with visits and transition plans. They have unilaterally made decisions to the detriment of the children's relationship with their mother. But [the mother's] actions have, without more, put the children in jeopardy. They have suffered serious emotional harm at her hands, and would continue to do so if returned to her care.

[¶11] In its findings, the District Court also described three of the incidents that served as the basis for the grandmother's September 1, 2017, motion to the Probate Court:

In late August, [the boy] came downstairs to his grandmother; [the mother] was upstairs. He had bite marks on his right shoulder, and reported that his mother bit him. This was confirmed by [the girl]. While apparently [the mother] regularly playfully nipped the children on the ear and the like, this biting left marks and was not appropriate.

Later that same evening, [the grandmother] was downstairs and [the boy] was playing with another child in a bedroom with [the mother]. [The grandmother] heard [the boy] screaming and rushed upstairs to the bedroom. There she found [the boy] on the floor, the other child "stomping" on [the boy's] head, blood under him, and [the mother] sitting there and not intervening while [the boy] screamed. [The grandmother] was able to separate the children and [the boy] did not suffer any serious injury. When asked why she did not intervene to protect [the boy], the mother said she cannot touch another child. Even afterwards she maintained that she would not have done anything differently.

A few days later, on August 30, [the boy] placed band-aids on his face before a visit with his mother. [The grandmother] gave him a magic marker, and he wrote on the bandages something to the effect of "why are you kidnapping me again." Rather than consoling him or talking about his concerns, [the mother] ripped the bandages off, apparently oblivious to any problem.

[¶12] Unlike the District Court, the Probate Court previously rejected accounts of these incidents because the grandmother did not present "convincing evidence" of her allegations and the Probate Court concluded that the evidence did not "suggest[] circumstances of jeopardy to the children's health and welfare." (Quotation marks omitted.)

[¶13] The mother timely appealed the District Court's judgment. *See* 22 M.R.S. § 4006 (2017); M.R. App. P. 2B(c)(1).

## II. DISCUSSION

A. Res Judicata

[¶14] The mother argues that the District Court erred when it concluded that the doctrine of res judicata did not make the orders of the Probate Court binding on the Department. She asserts that the Department was barred from relitigating its claim that the mother exposed the children to jeopardy and that the Department was estopped from contesting factual findings issued by the

Probate Court. We review de novo a determination that res judicata does not bar litigation. *See Guardianship of Jewel M.,* 2010 ME 80, ¶ 38, 2 A.3d 301.

[¶15] "The doctrine of res judicata . . . is a court-made collection of rules designed to ensure that the same matter will not be litigated more than once." *Pushard v. Bank of Am., N.A.*, 2017 ME 230, ¶ 19, 175 A.3d 103 (quotation marks omitted). Res judicata encompasses two different legal theories: claim preclusion (bar) and issue preclusion (collateral estoppel). *See id.* "Claim preclusion prohibits relitigation of an entire cause of action between the same parties or their privies, once a valid final judgment has been rendered in an earlier suit on the same cause of action." *Id.* (quotation marks omitted). "Issue preclusion . . . prevents the relitigation of factual issues already decided if the identical issue was determined by a prior final judgment, and . . . the party estopped had a fair opportunity and incentive in an earlier proceeding to present the same factual issue or issues it wishes to litigate again in a subsequent proceeding. Collateral estoppel arises only if the identical issue necessarily was determined by a prior final judgment." *Guardianship of Jewel M.,* 2010 ME 80, ¶ 39, 2 A.3d 301 (citations omitted) (quotation marks omitted). "Principles of res judicata must be applied with caution in domestic relations cases, as new developments often inform decisions as to what may be

in the best interest of a child in circumstances where relationships must continue and will change over time until a child reaches majority." *Id.* ¶ 41.

[¶16] Common to both legal theories is the requirement that the party sought to be barred or estopped from litigating the claim or issue was a party or privy to a party in the earlier case. *See In re M.M.*, 2014 ME 15, ¶ 16, 86 A.3d 622 (explaining that claim preclusion requires that the same parties or their privies are involved in both actions); *Beal v. Allstate Ins. Co.*, 2010 ME 20, ¶ 18, 989 A.2d 733 (explaining that where, as here, "a party asserting nonmutual collateral estoppel—where the parties are not the same parties or privies to the prior proceeding—must establish that the party to be estopped was a party or in privity with a party in the prior proceeding"). Because the Department was not a party to the probate proceeding, we will not apply res judicata to the probate proceedings unless we conclude that the Department was in privity with the grandmother.

[¶17] "Privity exists when two parties have a commonality of ownership, control, and interest in a proceeding." *In re M.M.*, 2014 ME 15, ¶ 16, 86 A.3d 622 (quotation marks omitted). We agree with the District Court that the grandmother and the Department did not have the same ownership, control, and interest in the probate proceedings. Although the Department has been

involved with the family over the years and a Department caseworker was called to testify at the September 2017 probate hearing, the court was correct when it determined that "[t]he Department could advise and inform [the grandmother], but [it] could not control her actions or interests in the probate proceeding."

[¶18] Contrary to the mother's contentions, the Department and the grandmother did not have the same interest in the proceeding, either. We agree with the District Court that "[t]he Department's interest is defined by statute; even if [the grandmother had] the best interest of the children at heart, [the grandmother had] her own interest at stake." By statute, the Department is required "to protect abused and neglected children and children in circumstances that present a substantial risk of abuse and neglect, to prevent further abuse and neglect, to enhance the welfare of these children and their families and to preserve family life wherever possible." 22 M.R.S. § 4004(2) (2017). The Department is also required to file petitions for child protection if, after investigation, the Department "determines that a child is in immediate risk of serious harm or in jeopardy as defined in [chapter 1071]." 22 M.R.S. § 4004(2)(F). At the jeopardy hearing, the court must make a determination of the question of jeopardy. *See* 22 M.R.S. § 4035(2) (2017). Thus, the

14

Department's interest in a child protection proceeding can be characterized as protecting the child from jeopardy and enhancing the child's welfare, and because the Department must preserve family life whenever possible, the Department must aid the court in reaching the proper determination on the question of jeopardy.

[¶19]  In contrast, the statute governing guardians does not compel a guardian to align her interests with the Department's interests and statutory obligations.  *See* 18-A M.R.S. § 5-209 (2017) (explaining that the guardian has the powers and responsibilities of a *parent*).  The guardian is permitted to act with the goal of retaining custody, and that interest may conflict with the Department's interest in protecting children and preserving family life whenever possible.  In this case, the District Court found that the grandmother has involved the children in the conflict with the mother and has made decisions to the "detriment of the children's relationship with their mother," which suggests that she was not interested in preserving the family and has not always acted to "enhance the welfare" of the children.  *See* 22 M.R.S. § 4004(2).

[¶20]  The court did not err when it declined to apply res judicata in this case because the Department and the grandmother were not in privity in the probate proceedings.  In order to fulfill its legislative mandate, the Department

was not barred from litigating its claim that the children were in jeopardy and presenting evidence on issues already decided by the Probate Court.

B.     Due Process

[¶21]  The mother next argues that the Department and the District Court violated her due process rights when she was subjected to a second judicial proceeding on the same claims and facts that the Probate Court decided in her favor while the child protection proceedings were pending.

[¶22]  We described a parent's right to due process in child protection proceedings and the applicable test in our decision in *In re M.P.*:

> When analyzing whether a party was afforded the process that is due, we balance the three factors articulated by the Supreme Court of the United States in *Mathews v. Eldridge*, 424 U.S. 319 [(1976)]:
>
>> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*In re M.P.*, 2015 ME 138, ¶¶ 30-31, 126 A.3d 718 (citations omitted) (quotation marks omitted).  Our review of an alleged constitutional violation is de novo. *See State v. Jones,* 2012 ME 126, ¶ 35, 55 A.3d 432.

[¶23]   With regard to the first factor, the mother's right "to make decisions concerning the care, custody, and control of [her children]" is a fundamental liberty interest that is protected by the Due Process Clause.  *See Rideout v. Riendeau,* 2000 ME 198, ¶ 18, 761 A.2d 291 (quotation marks omitted).  That constitutional liberty interest is not absolute or free from state interference, and although the Due Process Clause provides heightened protection against state intervention, it is "not an impenetrable wall behind which parents may shield their children."  *Id.* ¶ 19.  As to the third factor, "the State has a compelling interest in limiting, restricting, or even terminating a parent's rights when harm to the child will result from the absence of such governmental interference," *Pitts v. Moore*, 2014 ME 59, ¶ 14, 90 A.3d 1169, as well as "a significant interest in obtaining stability and permanency for children within a reasonable time," *In re M.P.*, 2015 ME 138, ¶ 32, 126 A.3d 718.

[¶24]  Bearing these competing interests in mind, we consider the second factor and what due process necessitates in child protection proceedings: "notice of the issues, an opportunity to be heard, the right to introduce evidence and present witnesses, the right to respond to claims and evidence, and an impartial fact-finder."  *In re Robert S.*, 2009 ME 18, ¶ 14, 966 A.2d 894 (quotation marks omitted).   The mother argues that the District Court

proceedings "deprived her of a meaningful process to vindicate her rights," but she does not point to a deprivation of any particular procedural right. Indeed, the record shows that the mother had notice of the issues, was represented by counsel, was present at the District Court hearings, introduced evidence and presented witnesses, cross-examined the Department's witnesses, and had an impartial fact-finder who ensured that she understood the potential consequences associated with the proceedings. *See id.* It is true that the Probate Court and District Court reached different conclusions after hearing some of the same evidence and from some of the same witnesses, but this does not amount to a deprivation of being heard in a meaningful time and in a meaningful manner. *See In re M.P.*, 2015 ME 138, ¶ 38, 126 A.3d 718.

## III. CONCLUSION

[¶25] We conclude that the procedures followed by the District Court were adequate to protect the mother's liberty interest while at the same time safeguarding the State's interest in protecting these children and promoting stability and permanency without further delay. *See id.* ¶ 37. No due process violation has been demonstrated on this record. Further, although not argued by the mother, the District Court's findings are supported by competent evidence in the record that can rationally be understood to establish as more

likely than not that the children were in circumstances of jeopardy to their health and welfare. *See* 22 M.R.S. § 4035(2); *In re Nicholas S.*, 2016 ME 82, ¶ 9, 140 A.3d 1226. Accordingly, we affirm the court's jeopardy determination.

[¶26] Finally, we note that, in spite of the significant benefits and protections provided by the Home Court Act, 4 M.R.S. § 152(5-A), this case highlights a problem that may recur because the District Court and Probate Court continue to have jurisdiction over child-related litigation that may permit nearly simultaneous proceedings in each forum concerning custody of the same children. *See* 4 M.R.S. § 152(5-A); *see, e.g.*, 18-A M.R.S. § 5-102 (granting the Probate Court exclusive jurisdiction over guardianship proceedings, subject only to the Home Court Act, 4 M.R.S. § 152(5-A)); 22 M.R.S. § 4031 (2017) (giving the District Court exclusive jurisdiction over child protection proceedings, except that the Probate Court and Superior Court have concurrent jurisdiction to act on requests for preliminary child protection orders pursuant to 22 M.R.S. § 4034 (2017)). Because the Department did not file a child protection proceeding in the District Court until the Probate Court was about to issue a final order in the probate case, even under the Home Court Act, the District Court had no occasion to consolidate the proceedings until there had already been a significant litigation event.

[¶27] In the end, the jurisdictional overlap led to the situation in this case where much of the same evidence regarding the custody and best interests of the same children was heard in two different forums, applying similar but not identical standards. Given the separately created jurisdictions of the two courts, the differing parties, and the different standards at play as between a guardianship and a child protection proceeding, the resulting determinations of the District Court could lawfully vary substantially from those of the Probate Court. The fact that the children were the subject of five different custody orders between August and December 2017, and that the courts could reach such substantially different results, creates an understandable sense of frustration for the families involved. Until a unified system of child-related litigation is established by the Legislature, these distressing events may continue to occur.

The entry is:

Judgment affirmed.

Rory A. McNamara, Esq. (orally), Drake Law, LLC, Berwick, for appellant mother

Janet T. Mills, Attorney General, and Meghan Szylvian, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee Department of Health and Human Services

Elyse Marye Apantaku, Esq., Schneider & Brewer, Waterville, for appellee grandmother

Waterville District Court docket numbers PC-2017-41 and PC-2017-42
FOR CLERK REFERENCE ONLY